**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SECURITIES AND EXCHANGE COMMISSION, :
                                    :
            Plaintiff,              :
                                    :
      v.                            :
                                    :        Civil Action No. 1:19-cv-08454
TODAY'S GROWTH CONSULTANT, INC.     :
(dba THE INCOME STORE)              :
                                    :
and                                 :
                                    :
KENNETH D. COURTRIGHT, III,         :
                                    :
            Defendants.             :
                                    :
_____

MELANIE E. DAMIAN, as Receiver for
TODAY'S GROWTH CONSULTANT, INC.              ANCILLARY CASE NO.
(dba THE INCOME STORE),

      Plaintiff,

v.

EIN CAP, INC., ALPHA CAPITAL SOURCE, INC.,
BMF CAPITAL, LLC, FUNDKITE, LLC, AKF, INC.,
WORLD GLOBAL CAPITAL, LLC, FOX CAPITAL GROUP,
INC., HIGH FIVE GROUP, LLC, and SUTTON
FUNDING NY, INC.,

      Defendants.
_____/

## **COMPLAINT**

Plaintiff, Melanie E. Damian, in her capacity as the Court-Appointed Receiver (the

"Receiver") for Today's Growth Consultant, Inc. (dba "The Income Store") in the action titled

*Securities and Exchange Commission v. Today's Growth Consultant Inc., et al.,* Case No. 1:19-

Case: 1:21-cv-01792 Document #: 1 Filed: 04/02/21 Page 2 of 57 PageID #:2

cv-08454 (N.D. Ill. Dec. 27, 2019) (the "SEC Action") hereby sues Defendants, EIN CAP, Inc.

("EIN"); Alpha Capital Source, Inc. ("Alpha"); BMF Capital, LLC ("BMF"); FundKite, LLC,

AKF, Inc., and World Global Capital, LLC (all three entities d/b/a FundKite) (collectively,

"FundKite"); Fox Capital Group, Inc. a/k/a Fox Business Funding ("Fox"); and High Five Group,

LLC ("High Five") (each, a "Funder" or "Defendant" and collectively, the "Funders" or

"Defendants"), and Sutton Funding NY, Inc. ("Sutton", "Defendant" or "Broker"). Plaintiff asserts

claims for fraudulent transfer, unjust enrichment, aiding and abetting breach of fiduciary duty, and

aiding and abetting fraud against the Funders and claims for unjust enrichment against the Broker

and alleges follows:

## PROCEDURAL HISTORY

1.       On December 27, 2019, the Securities and Exchange Commission ("SEC") filed an

enforcement action against TGC and Courtright, *SEC v. Today's Growth Consultant Inc.,* Case

No. 1:19-cv-8454 (N.D. Ill.) [ECF No. 2] (the "SEC Action"). On December 30, 2019, the Court

entered a Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief

[ECF No. 20] ("TRO") and an Order Appointing Receiver [ECF No. 19] ("Appointment Order")

in the SEC Action. The TRO ordered all of the Defendants' assets frozen to preserve the *status*

*quo*. *See* ECF No. 20 at pp. 6-7. Further, the TRO ordered the preservation of all Defendants'

documents, books and records concerning (1) the allegations of the Complaint, (2) any securities

offered for sale by Defendant Today's Growth Consultant, Inc. (dba The Income Store) ("TGC")[1],

including, but not limited to the Consulting Performance Agreements (the "CPAs"), (3) any

communications with, between, or among either Defendant. *See* ECF No. 20 at pp. 7-8.

---

[1] Capitalized terms herein not otherwise defined are given the definition ascribed to such terms in
the Court's Orders.

2.      The Receiver's mandate was to take all actions necessary to implement the terms of the TRO by, among other things, taking possession, custody, and control of all of Defendants' assets, establishing control of TGC's business, ensuring that Defendants' assets were frozen and preventing their withdrawal or misapplication, obtaining and preserving documents and records pertaining to Defendants' assets, transactions and business operations, and performing all acts necessary to protect and preserve the Receivership Estate. *See* ECF No. 19 at pp. 2-4.

3.      The Receiver analyzed the business operations, including projected and historic income and expenses and determined that without additional investor funds the operations were not sustainable even in the short term. Even with substantial infusion of investor funds, the TGC/Income Store records indicate a loss in 2018 of $5.7 million and in 2019 of $7.5 million. Indeed, the payroll expense alone exceeded the website/e-commerce revenue.

4.      The Receiver's review of the books and records of the company confirm the SEC's allegations that new investor funds and loans were used to pay the investors/website partners, not website revenue. For example, in 2018 website revenue was under $2 million and website payout to investors was approximately $12.7 million and likewise in 2019 website revenue was under $4 million and website investor payout was $16.5 million.  In short, this was a Ponzi scheme.

5.      On February 4, 2020, a criminal complaint was filed against Courtright, accusing him of committing wire fraud. *United States of America v. Kenneth E. Courtright,* Case No. 20CR-77 (N.D. Ill.).

6.      Then, on March 2, 2020, this Court entered two separate stipulated preliminary injunction orders titled Order Imposing Preliminary Injunction Freezing Assets and Granting Other Relief [ECF Nos. 55, 56] (collectively, the "PI Orders") against each of TGC and Courtright, which

shall remain in effect until the Court's determination of the merits of the allegations set forth in the SEC's Complaint or further order of the Court.

## THE PARTIES

### The Receiver

7.      Plaintiff, Melanie E. Damian, was appointed by this Court as Receiver over TGC. Plaintiff brings this action in her capacity as Receiver, pursuant to the authority granted by this Court in the TRO, Appointment Order, and each of the PI Orders entered in the SEC Action.

### The Defendants

8.      EIN CAP, Inc. is a New York corporation with its principal place of business located in New York, New York. EIN describes itself as not just an investor or a source of capital, but also, "experienced entrepreneurs who have launched, created and funded many businesses." TGC initiated its financial relationship with EIN in August 2019.

9.      Alpha Capital Source, Inc. is a New York corporation with its principal place of business located in New York, New York.  Alpha describes itself as a merchant cash advance ("MCA") business whose "focus is on C and D paper. Bad credit funding. We strive on the undo-able files." TGC initiated its financial relationship with Alpha in October 2019.

10.     BMF Capital, LLC is a New York corporation with its principal place of business located in New York, New York. BMF describes itself as the leading MCA funder in the financial world. TGC initiated its financial relationship with BMF in August 2019.

11.     FundKite, LLC, AKF, Inc., and World Global, LLC all d/b/a FundKite are each incorporated in New York with their principal place of business located in New York, New York. FundKite describes itself as specialists in small business funding providing alternative sources of funding and in house underwriting, "in as soon as 24 hours." TGC initiated its financial relationship with FundKite in May 2019.

4

12.     Fox Capital Group, Inc. a/k/a Fox Business Funding is a Florida corporation with its principal place of business located in Hallandale Beach, Florida. Fox describes itself as "an alternative source of business funding" that helps "businesses procure the working capital they need." TGC initiated its financial relationship with Fox in November 2019.

13.     High Five Group, LLC is a New York corporation with its principal place of business located in New York, New York. High Five is an MCA funder. TGC initiated its financial relationship with High Five in October 2019.

14.     Sutton Funding NY, Inc. is a New York corporation with its principal place of business located in New York, New York. Sutton describes itself as an expert in connecting small businesses with alternative sources of business funding such as merchant cash advances and receivables financing. Sutton acted as a broker procuring funding from the Funders for TGC and it received payment as a result of those services. TGC initiated its financial relationship with Sutton in or around May 2019.

**Non-Party Receivership Defendant Kenneth Courtright and Wife Kerri Courtright**

15.     Kenneth Courtright is a Receivership Defendant in the underlying SEC Action resulting from his operation of TGC as a Ponzi scheme. He and his wife Kerri Courtright were officers and control persons for TGC and executed the MCA agreements and guarantees.

**JURISDICTION AND VENUE**

16.     This Complaint is brought to accomplish the ends sought and directed by the District Court in the SEC Action, which, among other things, appointed Plaintiff as Receiver and authorized her to commence actions to recover assets of the Receivership Estate. This action is related to the claims in the SEC Action, over which this Court has original jurisdiction pursuant to Title 28, United States Code, Section 1331, in that this action forms "part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  Pursuant to

the principles of ancillary jurisdiction or supplemental jurisdiction, this Court has supplemental jurisdiction over the claims set forth herein pursuant to Title 28, United States Code, Section 1367(a). Therefore, this Court has subject matter jurisdiction over this action.

17.     Plaintiff was appointed as Receiver in this District; the instant Complaint is brought to accomplish the objectives of the TRO, the PI Orders and the Appointment Order.

18.     This Court has personal jurisdiction over Defendants because Defendants conducted business with TGC, which was operating, conducting, engaging in, and carrying on a fraudulent business or venture in, among other locations, the Northern District of Illinois. The profits and transfers that Defendants received from TGC were proceeds from TGC's fraudulent scheme conducted, in part, in the Northern District of Illinois. TGC is incorporated in Illinois and had its headquarters in Minooka, Illinois.

19.     Venue is proper in the Northern District of Illinois, pursuant to Title 28, United States Code, Sections 754, 1391(b) and 1692, because this action is brought to accomplish the objectives of the TRO, the Appointment Order, and the PI Orders and is thus ancillary to the Court's exclusive jurisdiction over the Receivership Estate. Further, certain of the acts described in this Complaint occurred in the Northern District of Illinois, and, upon information and belief, victims of TGC's scheme were located in the Northern District of Illinois.

## THE RECEIVER'S STANDING
## TO BRING THE CLAIMS ASSERTED HEREIN

20.     The Receiver has standing to bring the claims asserted in this Complaint pursuant to the Court's TRO, Appointment Order, and PI Orders. The Receiver's mandate was to, *inter alia*, take possession, custody, and control of all of TGC's assets, establish control of TGC's businesses (to the extent they exist and continue to operate), prevent the withdrawal or misapplication of TGC's funds, collect funds due to TGC, obtain documents and records pertaining to TGC's assets,

transactions, and business operations, and perform all acts necessary to preserve the value of the Receivership Estate.  *See* ECF No. 19 at pp. 2-4.

21.     Pursuant to the Appointment Order, the Receiver is directed to "assume and control the operation of Receivership Defendant and shall pursue and preserve all claims or interests of the Receivership Defendant."  *See* ECF No. 19, at p. 3.  Included among such claims are fraudulent transfer actions to recover for the benefit of the Estate amounts that TGC fraudulently transferred to third parties.

## FACTUAL ALLEGATIONS

### Courtright's Fraudulent Scheme

22.     TGC's Ponzi scheme was organized and perpetrated by Courtright, TGC's owner and control person, as a result of his fraudulent domination, adverse interest in, and control of TGC and as part of his continued breaches of fiduciary duties to TGC. TGC's only other owner was Courtright's wife, Kerri.

23.     From at least January 2017 through October 2019, TGC and Courtright raised at least $87 million from more than 700 investors who entered into the CPAs pursuant to which the investors would provide up-front payments and ongoing payments in the form of advertising and e-commerce revenues to TGC and TGC promised to pay investors a minimum guaranteed rate of return, in perpetuity, on revenues generated by websites that TGC acquires or builds for the investors and then develops, maintains, and hosts.

24.     In particular, under the CPAs, each investor typically was entitled to the greater of either 50% of their website revenues or a minimum annual guaranteed return (ranging from 13% to 20% of the initial investment amount) to be paid monthly, even if the website did not generate sufficient revenue to pay the promised monthly payment.

7

25.     Further, the Agreements provided that the investor's up-front fee was to be used "exclusively for the purchase, hosting, maintenance and marketing of the revenue generating website…."

26.     And, TGC represented to the investors that it was in "satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties" and that it is "debt-free . . . with no accounts payable or loans outstanding."

27.     The foregoing representations to investors were false and not supported by TGC's own records. Indeed, the revenue that was generated from the websites each month was significantly less than the monthly payment obligations to the investors and certainly was not sufficient to cover both those monthly payments and TGC's monthly overhead expenses. In addition, despite contrary representations to the investors, the websites and domains with minor exceptions were maintained in the name of, and owned by, TGC and not the individual investors. And, TGC, for at least the past three years, was not solvent or financially able to pay its bills when due (without the improper use of new investor funds) to meet its contractual obligations.

28.     In particular, since at least January 2017, the websites generated approximately $9 million in advertising and product sales revenue, but TGC paid at least $30 million to investors, purportedly pursuant to the Agreements.

29.     TGC was able to cover this significant shortfall primarily by using the up-front payments it received from new or repeat investors who entered into CPAs with TGC, making the business a classic Ponzi scheme. TGC's bank records show that TGC raised approximately $87,647,273 from individuals and entities between January 2017 and October 2019.

30.     In 2019 alone, according to the Profit and Losses accounting from the company's records, website income was $3,724,809, but TGC paid $16.5 million to investors.  And, TGC

generated "revenue" in the form of investments from investors (its largest source of revenue) of approximately $41.5 million and had operating expenses in the amount of $34,653,706, resulting in a net loss of $7,520,873.

31.     Prior years reflect a similar discrepancy in revenues generated from investors in comparison with the amounts paid to investors based upon their investments.

32.     As a result of this fraudulent behavior, the SEC commenced the SEC Action against TGC and Courtright that resulted in entry of the TRO and PI Orders containing preliminary findings that TGC and Courtright likely participated in a fraudulent securities scheme.

33.     At all times material hereto, Courtright, as principal and President, controlled and operated TGC as a means to carry out the fraudulent scheme, thereby causing TGC to commit violations of securities laws and rules, in breach of his fiduciary duties to TGC.  TGC was under the control of Courtright until the appointment of the Receiver and thus TGC was unable to cease the fraudulent activity and/or seek recovery of the misappropriated funds or fraudulent transfers prior to that point.

**The Insolvency of TGC**

34.     As a result of operating a Ponzi scheme, TGC was insolvent, undercapitalized, and operating at a loss. During all relevant times, TGC did not have sufficient assets to pay its debts to investors and/or creditors as those debts became due.

35.     From March 2015 through October 2019, the websites, collectively, generated revenues that were materially below investor payout amounts guaranteed by TGC. TGC nonetheless paid investors their guaranteed returns, monthly, until December 2019, when it put a moratorium on investor payouts.

36.     Because most investors have not received the return of their investment or all of the amounts due to them under the CPAs, these investors have asserted significant claims against the

9

Receivership Estate to recover their investments. The Receiver has approved claims totaling more than $65 million.

### Funders Engage in Commercially Unreasonable Behavior by Ignoring Their Industry-Standard Due Diligence and Extending Expensive Lifelines to TGC, Thereby Propping Up the Ponzi Scheme

37.    From May through December 2019, TGC engaged in MCA funding transactions with the various Funders and obtained funding for the company's ongoing operations, which in effect propped up the Ponzi scheme and allowed Courtright to continue his fraud against TGC and its investors.

38.    In the typical MCA process, a merchant applying for MCA financing submits various business information and documentation, including 12 months of bank statements, to the Funders for review and determination as to whether to approve the merchant for the MCA financing.

39.    The Funders' due diligence process is crucial to their business and plays a vital role in their ability to collect receivables from merchants or to lose significant sums of money—without recourse—in the event the merchant does not produce receivables.

40.    The Funders' due diligence review and analysis considers the merchant's overall financial health and position, existing and potential future cash flows, and, importantly, existing debt, including other outstanding MCA obligations.

41.    Funders typically avoid approving and funding merchants, like TGC, that are overleveraged and have multiple other outstanding advances, because these merchants may have a higher likelihood of not having sufficient receivables to repay all of their MCA purchases.

42.    All of the Funders' MCA agreements include a strict prohibition against accepting additional MCA financings during the duration of Plaintiffs' MCA financing, known as

"Stacking." Stacking occurs when a merchant takes out multiple cash advances from different MCAs at the same time, thereby making it less likely for the merchant to produce sufficient receivables to pay back any of them.

43.     Stacking is strictly prohibited in all of the Funders' MCA agreements—and in virtually every MCA agreement in the industry—because the Funders rely on the current financial status of the merchant to determine whether the merchant is likely to produce sufficient receivables to repay the purchase price.

44.     When a merchant engages in Stacking, it demonstrates risky business practices.

45.     Here, Funders violated their normal business practices by failing to investigate the amount and source of TGC's receivables in light of the significant outstanding debt and prior MCA obligations reflected in TGC's bank statements and financial statements. Indeed, it was commercially unjustifiable for each Funder to (i) disregard that TGC was already overly leveraged and that its source of revenue was almost solely large, irregular, lump sum transfers from investors into TGC's account, sums that did not appear to be receivables and (ii) refuse to learn readily available facts such as the source of the large, lump sum deposits, such that it was bad faith for each Funder to remain passive.

46.     Indeed, had Funders compared TGC's bank statements even just for the six-month period prior to providing the cash advance funding (from December 2018 through May 2019), they would have seen that the TGC bank account from which they swept funds shows a similar ratio of very few ACH credits compared to investor credits.

47.     TGC used one bank account at PNC Bank (the "PNC Account") to hold investor funds, to receive merchant cash advance funding, to make guaranteed payments to investors, and for all other business transacted by TGC, including the Courtrights' non-business, personal

expenses. Funders used this same PNC Account for their daily sweeps. Thus, TGC's extremely leveraged position with the Funders and the influx of large contributions from investors would have been clearly evident if Funders had properly reviewed just the 2019 bank statements for the PNC Account.

48.     Moreover, in TGC's Profit and Loss statements for January through July 2019, the investors are referred to as "Partners." The Profit and Loss statement demonstrates that the Partners are entitled to monthly payments of "Ad Revenue." It is also clear from that statement that the Ad Revenue is used to offset the monthly "Partner Payments." Thus, TGC's financial statements which were sent to Sutton and Funders and therefore available for review by Funders reflect that TGC had partners to whom TGC owed fiduciary duties and guaranteed monthly payments for their investments in the websites. The Income Statement also reflects that TGC purchased the sites for its Partners.

49.     TGC and its investors also entered into certain site partner agreements (the "Partner Agreements") that governed the investor relationship. Pursuant to those Partner Agreements, the investors made their large deposits into TGC's bank account, which deposits were later swept by the MCA Funders despite being investor funds. At least five different Partner Agreements were sent to Sutton and the Funders and therefore were available for review by the Funders. Those Partner Agreements clearly reflect that TGC had partners that made large deposits into TGC's bank account and to whom TGC owed fiduciary duties and guaranteed monthly payments for their investments in the websites.

**MCA Funders Received Fraudulent Transfers When They Improperly Swept Investor Funds to Repay Themselves**

50.     From May 2019 – November 2019, Sutton, a small business funding broker, connected TGC with various Funders. Sutton assisted TGC's management with the application

process to procure Merchant Cash Advance funding from EIN, BMF, and High Five. Sutton received a commission of $100,000 for its services related to the cash advance funding.

51.     The Merchant Cash Advance funding transactions were each documented in very similar agreements for the sale and purchase of receivables (collectively, the "Agreements") that TGC entered into with each Funder setting forth the terms and conditions of the deal, including the definition of the purchased receivables or future receipts ("Receipts"). The definition of Receipts is very similar in each Agreement and includes all payments made to TGC in the ordinary course of business as a result of the sale of goods and service provided by TGC.  For each of the funding deals, Kenneth and Kerri Courtright executed personal guarantees to the Funders guaranteeing TGC's performance under each Agreement.

52.     None of the agreements between TGC and the Funders gave the Funders the right to take funds deposited from investors or from other Funders or lenders. The Funders' sweeping of those types of deposits from TGC's account was not permitted pursuant to the Agreements between TGC and the Funders.

### **FundKite**

53.     On June 6, 2019, FundKite and TGC executed the Future Receivables Purchase and Sale Agreement for the purchase of $1,399,000 in "future receipts" for the purchase of price of $1,000,000. "Future receipts" was defined as "all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or vendees…."

54.     Prior to extending the funding, FundKite had the opportunity to carry out extensive due diligence on TGC's financial condition. Indeed, the Agreement allowed FundKite to charge TGC a fee of 10% of the purchase price ($100,000) for the costs of due diligence.

55.     In early June 2019, TGC provided FundKite with its bank records for December
2018 through May 2019. The bank records showed that, in May, TGC's PNC account received
only minimal revenue coming into the account in many small transfers (i.e., 61 deposits totaling
$64,000 in January 2019). The PNC account also received millions of dollars in wire transfers
nearly all in very large, rounded amounts (i.e., 26 transfers totaling $5.4 million in December
2019). The statements show that TGC commingled all of those transfers, regardless of the source,
in its PNC account.

56.     The six months of statements demonstrated that TGC operated at a loss or near
break-even in the months of December 2018 – April 2019 and at a loss of $570,000 in May 2019.
Moreover, TGC's bank statements show that the income into the company consisted of a minimal
amount of actual revenue – less than $100,000 in receipts each month.

57.     Indeed, the May 2019 bank records painted a picture of a company running at a
deficit making monthly, guaranteed payments to investors from meager receipts, held together by
infusions of funds in large, rounded numbers representing new investor funds.

58.     Despite a contractual right to extensive due diligence, FundKite did not ask TGC
for any further explanation regarding the investors' deposits in PNC's account, the minimal
receipts or the overall deficits. FundKite either did not question or ignored the obvious
commingling of the "receipts" with the large lump sum transfers from investors received into
TGC's PNC account. FundKite did not question or ignored the consistent, numerous monthly wires
out made from that same PNC account.

59.     Despite all of these red flags, on June 13, 2019, AKF, Inc. dba FundKite made a
payment to TGC for $287,815, for the purchase of future receipts, even though it was aware of
EIN's and BMF's prior purchase of TGC's receipts and had full access to information from TGC

14

concerning those prior cash advance transactions. And, on that same day, World Global, LLC dba FundKite made a second payment to TGC in the amount of $969,993. The total funding provided by FundKite purportedly represented 25% of TGC's future receipts.

60.     During the period of time from June to October 2019, while FundKite was sweeping TGC's PNC account, it requested and received the bank statements for that PNC account. Thus, FundKite reviewed the transfers coming into the PNC account and could see the continued pattern of minimal revenues coming in by ACH and credit card juxtaposed with the large lump sum wires of investor funds and the large lump sums received from other Funders.

61.     Despite the odd pattern of incoming funds, FundKite did not question the source of any of the funds coming into TGC's account and did not inquire whether it was appropriately sweeping receipts. FundKite did not ask any questions concerning TGC's revenue until October 2019 when it saw a drop in revenue and additional MCA funding in TGC's account. Then, FundKite investigated TGC's deals with Funders EIN and BMF and reviewed three months of TGC's bank statements.  Despite knowing at this point that the funds in TGC's account were from other Funders or were large deposits made pursuant to investors' contracts, and thus, not "Receipts," as defined in their agreement, FundKite continued to sweep funds from TGC's account.

62.     Then, when FundKite realized that TGC had also taken funding from Alpha, it demanded immediate repayment of the balance due for the purchased "Receipts" including $22,500 in default fees. Indeed, at the end of October 2019, FundKite swept all of the TGC funds that it could grab, including investor deposits and funds from other Funders that were not "Receipts." Then, FundKite promptly ended its relationship with TGC.

63.     From June 14, 2019 through October 28, 2019, AKF, Inc. dba FundKite swept $439,501.14 from TGC's PNC Account used for holding investor funds to repay the first round of funding. FundKite made a net profit of $151,686.14 on that first round of funding by sweeping investor funds from TGC's account.

64.     From June 14, 2019 through October 28, 2019, World Global LLC dba FundKite swept $1,259,118 from TGC's PNC Account used for holding investor funds to repay the first round of funding. FundKite made a net profit of $289,125 by sweeping investor funds from TGC's account.

65.     On August 16, 2019, BMF provided funding to TGC in the amount of $435,000, pursuant to a Purchase and Sale of Future Receivables agreement dated August 16, 2019. On October 28, 2019, BMF extended a second round of funding to TGC in the amount of $535,000, replacing and rolling over the outstanding balance from the August purchase of receivables, pursuant to a Purchase and Sale of Future Receivables agreement dated October 23, 2019. In December 2019, TGC declined certain sweeps totaling $174,993 attempted by BMF.

66.     Thus, based upon minimal due diligence, BMF purchased a total of $1,124,250 of TGC's "Receipts" for the purchase price of $750,000. BMF was entitled to sweep from TGC's bank account 10% of each "Receipt" for each transaction carried out by TGC.  In the agreement with BMF, "Receipts" is defined as all payments from customers and other third-party payors made in the ordinary course of business for payment of Merchant's sale of goods or services.

67.     From August 19, 2019 through December 20, 2019, BMF swept $1,669,333 from TGC's PNC Account used for holding investor funds to repay the first round of funding. BMF made a net profit of $524,340 by sweeping investor funds from TGC's account.

**EIN**

68.     On August 15, 2019, EIN and TGC entered into the Agreement for Purchase and Sale of Future Receivables ("EIN Agreement") for the purchase of $702,900 in future receipts, defined as payments for TGC's sale of goods and services, for a purchase price of $495,000. As part of that Agreement, TGC granted EIN a Permission to Release Information allowing EIN to obtain trade, banking, and landlord information regarding TGC from third parties in possession of that information.

69.     Without making further inquiry, on August 16, 2019, EIN provided funding to TGC in the amount of $444,060.50 ($495,000 in funding minus Funder's fees). And, on October 29, 2019, EIN extended a second round of funding to TGC in the amount of $533,006, rolling over the outstanding balance from the August purchase of receivables, pursuant to a Purchase and Sale of Future Receivables agreement dated October 22, 2019 ("EIN Second Agreement").

70.     On October 16, 2019, FundKite pointed out to TGC that its revenue was extremely low and wanted to know why the revenue numbers had dropped dramatically. And, on October 24, 2019, American Express Gold stopped accepting TGC's charges due to reaching its credit limit. Also, FundKite exercised its lien on credit card receipts and froze all payments coming in through Stripe.

71.     Nevertheless, on October 29, 2019, EIN revised the EIN Agreement and extended a second round of funding to TGC in the amount of $533,006 pursuant to the EIN Second Agreement. In addition, on November 1, 2019, EIN provided a small refund to TGC in the amount of $23,430 for over payment of the balance on the first round of funding.

72.     Thus, based upon minimal due diligence, EIN purchased a total of $1,124,250 of TGC's "Receipts" for the purchase price of $750,000. EIN was entitled to sweep from TGC's bank

account 15% of each Receipt for each transaction carried out by TGC. In each of the EIN Agreements, "Receipts" was defined as all payments from customers and other third-party payors made in the ordinary course of business for payment of Merchant's sale of goods or services.

73.     From August 16, 2019 through December 20, 2019, EIN swept $1,260,300 from TGC's PNC Account used for holding investor funds to repay the first round of funding. In December 2019, TGC declined certain sweeps attempted by EIN totaling $74,950. Notwithstanding, by late December, EIN had made a net profit of $184,824.72 by sweeping investor funds from TGC's account.

**Alpha**

74.     Thereafter, despite the fact that many other Funders had purchased TGC's receivables and their funding and daily sweeps were clearly reflected on TGC's account statements, Alpha provided additional receivables funding to the beleaguered TGC. Alpha had access to TGC's financial statements, bank statements, and the Partner Agreements. Nevertheless, Alpha apparently engaged in very minimal due diligence, if any.

75.     On October 16, 2019, Alpha and TGC entered into the Future Receivables Agreement $1,011,825 in future "Receipts," defined as payments for TGC's sale of goods and services, for the purchase price of $675,000. Pursuant to its Agreement, Alpha provided funding to TGC in the amount of $600,750 ($675,000 in funding minus loan fees) for the right to sweep 12% of every "Receipt" deposited into TGC's account.

76.     From October 17, 2019 through December 23, 2019, Alpha swept $809,460 from TGC's PNC Account used for holding investor funds to repay the first round of funding. In December 2019, TGC declined certain transfers to Alpha totaling $89,940. Alpha made a net profit of $118,770 by sweeping investor funds from TGC's account.

### High Five

77.     Thereafter, on October 18, 2019, High Five provided merchant cash advance funding to TGC in the amount of $1,150,005 ($1,500,000 in funding minus Funder's fees) for the purchase of future "Receipts" "for the payments due to Merchant as a result of Merchant's sale of goods and services" totaling $2,224,850, pursuant to the Merchant Agreement entered into between TGC and High Five on October 17, 2019.  High Five must have done very minimal due diligence, if any, prior to entering into the Merchant Agreement with TGC.

78.     From October 21, 2019 through November 13, 2019, High Five swept $80,000 per day from TGC's account purportedly representing 10% of TGC's Receipts. In all, High Five swept $2,240,499 in purported receipts from TGC's PNC Account used for holding investor funds. High Five made a net profit of $1,090,494 by sweeping investor funds from TGC's account.

### Fox

79.     In mid-September 2019, in need of yet more financing, TGC contacted Fox's agent, Sam Green, to inquire about funding for TGC's ongoing operations, and Fox thereafter commenced due diligence research into TGC's operations and finances.

80.     On October 25, 2019, Fox obtained from TGC a spreadsheet of all MCA funding it had obtained to that date and payment schedules for each. The spreadsheet informed Fox that, since June 2019, TGC had already incurred debt in the form of MCA agreements with five other MCA lenders totaling $6,485,075. Moreover, the spreadsheet informed Fox that TGC's payments due on those debts would spike from $184,223 per week in early October to $994,163 per week in late October.

81.     On October 25, 2019, TGC also provided Fox with its bank records for August and September 2019. The bank records showed that, in August, TGC's main account received

19

$6,324,749.35 in credits, including $819,892.73 in ACH credits (which include $150,000 in funds from Assurance Financial, $440,060.50 from EIN Capital Inc.), and $5,045,970.70 in wire transfers (nearly all in rounded amounts). The August 2019 statement also showed that TGC debited $6,821,792.66, including $4,439,976 in ACH debits, wired out $956,052.35 as funds transfers, and wired out $1,390,212.30 in other debits.

82.     Thus, the August 2019 statement not only demonstrated that TGC operated at a loss of $500,000 for the month, but also that the income into the company consisted of a minimal amount of actual revenue – less than $200,000 in receipts.

83.     The September 2019 bank records painted a similar picture of a company running at a deficit, with meager receipts, held together by infusions of loans and investor funds in large, rounded numbers.

84.     On November 7, 2019, TGC provided Fox with its bank records for October and November 2019, to date. Once again, the bank records showed that TGC was running at a deficit and only treading water by virtue of loans and investor funds.

85.     The bank statements made it clear that the vast majority of the funds incoming to TGC were not "receipts" but rather infusions of loan and investor funds. Moreover, Fox could have, and in its normal course of business would have, reviewed one year's worth of bank records but failed or refused to do so.

86.     Nevertheless, with its knowledge of TGC's recent meager receipts and that TGC's business was operating at a loss, on November 7, 2019, Fox entered into the Secured Merchant Agreement with TGC.

87.     Pursuant to that Agreement, Fox paid TGC $750,000 for $1,124,250 of "Receipts", purportedly representing 25% of TGC's anticipated Receipts, with an estimated daily remittance of $25,551.14. The Agreement defined receipts as:

> all of Merchant's future accounts, contract rights, and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third-party payors (including all payments made by cash, check, electronic transfer, or other form of monetary payment in the ordinary course of the Merchant's business…) for the payments due to Merchant as a result of Merchant's sale of goods and/or services.

88.     On November 8, 2019, TGC received $637,500 (representing the $750,000 less $112,500 in Funder's fees) from Fox.

89.     TGC had only made one payment of the requisite $25,551.14 when, on November 13, 2019, Fox extended a new Secured Merchant Agreement with TGC ("November 13 Agreement"). Pursuant to the Agreement, Fox was to pay $1,650,000 for $2,473,350 of Receipts (defined the same way as in the First Agreement), again purportedly representing 25% of anticipated Receipts, with a daily remittance of $70,999.99. An addendum to the Agreement reflected that it subsumed the prior agreement for a total funding amount of $1,650,000. Kenneth Courtright executed a personal guarantee to Fox guaranteeing TGC's performance.

90.     On November 13, 2019, TGC received $660,000 (representing the additional $900,000 less $240,000 in fees) from Fox.

91.     Thereafter, TGC paid Fox two additional daily payments of $25,551.14 and commenced on November 15, 2019, to make 22 additional payments of $70,999 over the ensuing 30 days.  In all, from November 7 to December 13, 2019, Fox paid to TGC $1,510,497 and received $1,638,631.42 from TGC.

**Defendants Assisted Courtright in Perpetuating the TGC Ponzi Scheme**

92.     The payments made from TGC to each of the Defendants were not payments from Receipts as set forth in the various funding Agreements discussed *supra*. As the Defendants well knew or reasonably should have known, the source of the vast majority of the funds from which Defendants swept payments from TGC's account was from lenders and investors, not Receipts; therefore, Defendants were not entitled to receive the vast majority of the funds that they received from TGC.

93.     Indeed, the funding that Defendants provided to TGC facilitated and perpetuated Courtright's fraud against current investors and allowed for the recruitment of new investors.

94.     Thus, not only did Defendants not provide any reasonably equivalent value to TGC for the transfers they received from TGC (to which they were not entitled pursuant to the terms of the Agreements), but also Defendants increased the damages suffered by TGC by increasing the amounts owed to investors and creditors which will be reflected in any restitution that TGC will be required to pay.

95.     When TGC made the transfers to Defendants, TGC intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay them as they became due.

96.     Thus, TGC had the actual intent to delay, hinder or defraud investors and creditors, and made the Transfers to delay, hinder or defraud investors and creditors.

97.     TGC, and thereby the Receivership Estate, have been damaged significantly as a direct and proximate result of the transfers as alleged above. Such damages include, but are not limited to, losses due to the dissipation of investor funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

98.     Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, misappropriated or lost from TGC as a result of the fraudulent transfers to, and unjust enrichment of, Defendants and as a result of Defendants' participation in Courtright's breaches of fiduciary duty and fraud.

**The Receiver's Right to Bring These Claims**

99.     Plaintiff, the Receiver for TGC, did not and could not have discovered the facts constituting Defendants' misconduct until after her appointment as Receiver in the SEC Action on December 27, 2019. And, TGC could not have stopped Courtright's or Defendants' misconduct until it was out from under Courtright's adverse dominion and control upon the appointment of the Receiver. Thus, the claims asserted herein did not accrue until that date, and any applicable statutes of limitations were tolled until that date.

100.    All conditions precedent to filing this Complaint have been met.

101.    Because TGC was operated from its headquarters in Minooka, Illinois, the transactions with Defendants were carried out in Illinois, and the transfers came from bank accounts located in Illinois, Illinois law applies to the claims brought herein.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violations of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act**
**740 ILCS § 160/5(a)(1)**
**(Against EIN)**

102.    Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

103.    This is a claim to avoid and recover a fraudulent transfer pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

104.    Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

740 ILCS 160/5(a)(1).

105.    The Receiver, acting on behalf of the Receivership Estate of TGC, as a creditor of TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright caused TGC to make to EIN pursuant to the actual fraud prong of the statute.

106.    Courtright's transfers of funds to which EIN was not entitled and which were far in excess of the Receipts as described above were part of a Ponzi scheme, and thus as a matter of law, were made and/or directed by Courtright with actual intent to hinder, delay or defraud creditors. Specifically, Courtright made the transfers of investor and lender funds to EIN with intent to hinder, delay or defraud.

107.    As detailed above, Courtright fraudulently, acting through his fraudulent domination, adverse interest in, and control of TGC, caused TGC to make at least $1,260,300 in fraudulent transfers to Defendant EIN with an intent to hinder, delay, or defraud TGC's creditors.

108.    EIN received the Transfers without providing reasonably equivalent value in exchange for the Transfers.

109.    At the time that TGC made the transfers to EIN, Courtright was operating it as a fraudulent scheme and as a Ponzi scheme to the detriment of TGC and its investors and/or creditors, as determined by the Court in the TRO and PI Orders.

110.    TGC made the transfers to EIN in furtherance of that fraudulent scheme and Ponzi scheme.

111. At the time that TGC made the transfers to EIN, Courtright removed and/or concealed assets of TGC from the reach of its investors and/or creditors.

112. TGC made the transfers to EIN at Courtright's direction, as a result of his fraudulent domination, adverse interest in, and control of TGC and as part of his continued breaches of his fiduciary duties to TGC.

113. Thus, TGC had the actual intent to delay, hinder, or defraud creditors, and made the transfers to EIN to delay, hinder or defraud creditors. Consequently, the transfers were inherently fraudulent pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

114. Because TGC's transfers to EIN were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, the Receiver may avoid the transfers, pursuant to Section 8(a) of the Illinois Uniform Fraudulent Transfer Act.

115. As a direct and proximate result of TGC's fraudulent transfers to Defendant EIN, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $1,260,300, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant EIN: (1) determining that the transfers from TGC to Defendant EIN were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant EIN, in an amount up to the full amount of the transfers received by Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT II
## Violations of Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act
## 740 ILCS § 160/5(a)(2)
## (Against EIN)

116.    Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

117.    Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> > (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> >
> > (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(2).

118.    The Receiver, acting on behalf of the Receivership Estate of TGC, as a creditor of TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright caused TGC to make to each of the Funders pursuant to the constructive fraud prong of the statute. 740 ILCS 160/5(a)(2).

119.    The Transfers to Defendant EIN were made without TGC receiving reasonably equivalent value in exchange for the transfers or obligations incurred.

120.    Also, the transfers to EIN occurred when TGC's remaining assets were unreasonably small in relation to the business transaction(s) and when Courtright (through his fraudulent domination and adverse control over TGC) intended to incur or believed, or reasonably should have believed, that he would incur debts beyond TGC's abilities to pay as they became due.

121.    As a direct and proximate result of TGC's fraudulent transfers to EIN, the

Receivership Estate has been damaged or otherwise diminished in the amount of at least $1,260,300, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant EIN: (1) determining that the transfers from TGC to Defendant EIN were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant EIN in an amount up to the full amount of the transfers received by Defendant EIN, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT III
## Violations of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act
## 740 ILCS § 160/5(a)(1)
## (Against Alpha)

122. Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

123. This is a claim to avoid and recover a fraudulent transfer pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

124. Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

740 ILCS 160/5(a)(1).

125. The Receiver, acting on behalf of the Receivership Estate of TGC, as a creditor of

TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright caused TGC to make to each of the Funders pursuant to the actual fraud prong of the statute.

126. Courtright's transfers of funds to which Alpha was not entitled and which were far in excess of the Receipts as described above were part of a Ponzi scheme, and thus as a matter of law, were made and/or directed by Courtright with actual intent to hinder, delay or defraud creditors. Specifically, Courtright made the transfers of investor and lender funds to Alpha with intent to hinder, delay or defraud.

127. As detailed above, Courtright fraudulently, acting through his fraudulent domination, adverse interest in, and control of TGC, caused TCG to make at least $809,460 in fraudulent transfers to Defendant Alpha with an intent to hinder, delay, or defraud TGC's creditors.

128. Alpha received the transfers without providing reasonably equivalent value in exchange for the transfers.

129. At the time that TGC made the transfers to Alpha, Courtright was operating it as a fraudulent scheme and as a Ponzi scheme to the detriment of TGC and its investors and/or creditors, as determined by the Court in the TRO and PI Orders.

130. TGC made the transfers to Alpha in furtherance of that fraudulent scheme and Ponzi scheme.

131. At the time that TGC made the transfers to Alpha, Courtright removed and/or concealed assets of TGC from the reach of its investors and/or creditors.

132. TGC made the transfers to Alpha at Courtright's direction, as a result of his fraudulent domination, adverse interest in, and control of TGC and as part of his continued breaches of his fiduciary duties to TGC.

133.     Thus, TGC had the actual intent to delay, hinder, or defraud creditors, and made the transfers to Alpha to delay, hinder or defraud creditors. Consequently, the transfers were inherently fraudulent pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

134.     Because the transfers to Alpha were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, the Receiver may avoid the transfers, pursuant to Section 8(a) of the Illinois Uniform Fraudulent Transfer Act.

135.     As a direct and proximate result of TGC's fraudulent transfers to Alpha, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $809,460, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant Alpha:  (1) determining that the transfers from TGC to Defendant Alpha were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant Alpha, in an amount up to the full amount of the transfers received by Defendant Alpha, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

**COUNT IV**
**Violations of Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act**
**740 ILCS § 160/5(a)(2)**
**(Against Alpha)**

136.     Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

137.     Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

>> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(2).

138.    The Receiver, acting on behalf of the Receivership Estate of TGC, as a creditor of TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright caused TGC to make to each of the Funders pursuant to the constructive fraud prong of the statute. 740 ILCS 160/5(a)(2).

139.    The transfers to Defendant Alpha were made without TGC receiving reasonably equivalent value in exchange for the transfers or obligations incurred.

140.    Also, the transfers to Alpha occurred when TGC's remaining assets were unreasonably small in relation to the business transaction(s) and when Courtright (through his fraudulent domination and adverse control over TGC) intended to incur or believed, or reasonably should have believed, that he would incur debts beyond TGC's abilities to pay as they became due.

141.    As a direct and proximate result of TGC's fraudulent transfers to Alpha, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $809,460 and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant Alpha:  (1) determining that the transfers from TGC to Defendant Alpha were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant Alpha in an amount up to the full amount of the transfers received by Defendant Alpha, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

**COUNT V**
**Violations of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act**
**740 ILCS § 160/5(a)(1)**
**(Against BMF)**

142.    Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

143.    This is a claim to avoid and recover a fraudulent transfer pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

144.    Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

740 ILCS 160/5(a)(1).

145.     The Receiver, acting on behalf of the Receivership Estate of TGC, as a creditor of TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright caused TGC to make to each of the Funders pursuant to the actual fraud prong of the statute.

146.     Courtright's transfers of funds to which BMF was not entitled and which were far in excess of the receipts as described above were part of a Ponzi scheme, and thus as a matter of law, were made and/or directed by Courtright with actual intent to hinder, delay or defraud creditors. Specifically, Courtright made the transfers of investor and lender funds to BMF with intent to hinder, delay or defraud.

147.     As detailed above, Courtright fraudulently, acting through his fraudulent domination, adverse interest in, and control of TGC, caused TGC to make at least $1,669,333 in fraudulent transfers to Defendant BMF with an intent to hinder, delay, or defraud TGC's creditors.

148.     BMF received the transfers without providing reasonably equivalent value in exchange for the transfers.

149.     At the time that TGC made the transfers to BMF, Courtright was operating it as a fraudulent scheme and as a Ponzi scheme to the detriment of TGC and its investors and/or creditors, as determined by the Court in the TRO and PI Orders.

150.     TGC made the transfers to BMF in furtherance of that fraudulent scheme and Ponzi scheme.

151.     At the time that TGC made the transfers to BMF, Courtright removed and/or concealed assets of TGC from the reach of its investors and/or creditors.

152.     TGC made the transfers to BMF at Courtright's direction, as a result of his fraudulent domination, adverse interest in, and control of TGC and as part of his continued breaches of his fiduciary duties to TGC.

153.     Thus, TGC had the actual intent to delay, hinder, or defraud creditors, and made the transfers to BMF to delay, hinder or defraud creditors. Consequently, the transfers were inherently fraudulent pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

154.     Because the transfers to BMF were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, the Receiver may avoid the transfers, pursuant to Section 8(a) of the Illinois Uniform Fraudulent Transfer Act.

155.     As a direct and proximate result of TGC's fraudulent transfers to Defendant BMF, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $1,669,333, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant BMF:  (1) determining that the Transfers from TGC to Defendant BMF were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant BMF, in an amount up to the full amount of the transfers received by Defendant BMF, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT VI
### Violations of Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act
### 740 ILCS § 160/5(a)(2)
### (Against BMF)

156.     Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

157.     Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> > (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> >
> > (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(2).

158.     The Receiver, acting on behalf of the Receivership Estate of TGC, as a creditor of TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright caused TGC to make to each of the Funders pursuant to the constructive fraud prong of the statute. 740 ILCS 160/5(a)(2).

159.     The transfers to Defendant BMF were made without TGC receiving reasonably equivalent value in exchange for the transfers or obligations incurred.

160.     Also, the transfers to BMF occurred when TGC's remaining assets were unreasonably small in relation to the business transaction(s) and when Courtright (through his fraudulent domination and adverse control over TGC) intended to incur or believed, or reasonably should have believed, that he would incur debts beyond TGC's abilities to pay as they became due.

161.     As a direct and proximate result of TGC's fraudulent transfers to BMF, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $1,669,333, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant BMF: (1) determining that the transfers from TGC to Defendant BMF were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant BMF in an amount up to the full amount of the transfers received by Defendant BMF, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

### COUNT VII
### Violations of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act
### 740 ILCS § 160/5(a)(1)
### (Against FundKite)

162.     Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

163.     This is a claim to avoid and recover a fraudulent transfer pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

164.     Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

    (1) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

740 ILCS 160/5(a)(1).

165.    The Receiver, acting on behalf of the Receivership Estate of TGC, as a creditor of TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright caused TGC to make to each of the Funders pursuant to the actual fraud prong of the statute.

166.    Courtright's transfers of funds to which FundKite was not entitled and which were far in excess of the receipts as described above were part of a Ponzi scheme, and thus as a matter of law, were made and/or directed by Courtright with actual intent to hinder, delay or defraud creditors. Specifically, Courtright made the transfers of investor and lender funds to FundKite with intent to hinder, delay or defraud.

167.    As detailed above, Courtright fraudulently, acting through his fraudulent domination, adverse interest in, and control of TGC, caused TGC to make at least $1,708,612.14 in fraudulent transfers to Defendant FundKite (incorporated as both AKF, Inc. and World Global, LLC) with an intent to hinder, delay, or defraud TGC's creditors.

168.    FundKite received the transfers without providing reasonably equivalent value in exchange for the transfers.

169.    At the time that TGC made the transfers to FundKite, Courtright was operating it as a fraudulent scheme and as a Ponzi scheme to the detriment of TGC and its investors and/or creditors, as determined by the Court in the TRO and PI Orders.

170.    TGC made the transfers to FundKite in furtherance of that fraudulent scheme and Ponzi scheme.

171.    At the time that TGC made the transfers to FundKite, Courtright removed and/or concealed assets of TGC from the reach of its investors and/or creditors.

172.     TGC made the transfers to FundKite at Courtright's direction, as a result of his fraudulent domination, adverse interest in, and control of TGC and as part of his continued breaches of his fiduciary duties to TGC.

173.     Thus, TGC had the actual intent to delay, hinder, or defraud creditors, and made the transfers to FundKite to delay, hinder or defraud creditors. Consequently, the transfers were inherently fraudulent pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

174.     Because the transfers to FundKite were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, the Receiver may avoid the transfers, pursuant to Section 8(a) of the Illinois Uniform Fraudulent Transfer Act.

175.     As a direct and proximate result of TGC's fraudulent transfers to FundKite, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $1,708,612.14, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant FundKite:  (1) determining that the transfers from TGC to Defendant FundKite were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant FundKite, in an amount up to the full amount of the transfers received by Defendant FundKite, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT VIII
## Violations of Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act
## 740 ILCS § 160/5(a)(2)
## (Against FundKite)

176.     Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

177.     Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

>> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(2).

178.     The Receiver, acting on behalf of the Receivership Estate of TGC, as a creditor of TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright caused TGC to make to each of the Funders pursuant to the constructive fraud prong of the statute. 740 ILCS 160/5(a)(2).

179.     The transfers to Defendant FundKite were made without TGC receiving reasonably equivalent value in exchange for the transfers or obligations incurred.

180.     Also, the transfers to FundKite occurred when TGC's remaining assets were unreasonably small in relation to the business transaction(s) and when Courtright (through his fraudulent domination and adverse control over TGC) intended to incur or believed, or reasonably should have believed, that he would incur debts beyond TGC's abilities to pay as they became due.

181.    As a direct and proximate result of TGC's fraudulent transfers to FundKite, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $1,708,612.14, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant FundKite:  (1) determining that the transfers from TGC to Defendant FundKite were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant FundKite in an amount up to the full amount of the transfers received by Defendant FundKite, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

### COUNT IX
**Violations of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act**
**740 ILCS § 160/5(a)(1)**
**(Against High Five)**

182.    Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

183.    This is a claim to avoid and recover a fraudulent transfer pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

184.    Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

740 ILCS 160/5(a)(1).

185. The Receiver, acting on behalf of the Receivership Estate of TGC, as a creditor of TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright caused TGC to make to each of the Funders pursuant to the actual fraud prong of the statute.

186. Courtright's transfers of funds to which High Five was not entitled and which were far in excess of the receipts as described above were part of a Ponzi scheme, and thus as a matter of law, were made and/or directed by Courtright with actual intent to hinder, delay or defraud creditors. Specifically, Courtright made the transfers of investor and lender funds to High Five with intent to hinder, delay or defraud.

187. As detailed above, Courtright fraudulently, acting through his fraudulent domination, adverse interest in, and control of TGC, caused TGC to make at least $2,240,499 in fraudulent transfers to Defendant High Five with an intent to hinder, delay, or defraud TGC's creditors.

188. High Five received the transfers without providing reasonably equivalent value in exchange for the transfers.

189. At the time that TGC made the transfers to High Five, Courtright was operating it as a fraudulent scheme and as a Ponzi scheme to the detriment of TGC and its investors and/or creditors, as determined by the Court in the TRO and PI Orders.

190. TGC made the transfers to High Five in furtherance of that fraudulent scheme and Ponzi scheme.

191. At the time that TGC made the transfers to High Five, Courtright removed and/or concealed assets of TGC from the reach of its investors and/or creditors.

192.     TGC made the transfers to High Five at Courtright's direction, as a result of his fraudulent domination, adverse interest in, and control of TGC and as part of his continued breaches of his fiduciary duties to TGC.

193.     Thus, TGC had the actual intent to delay, hinder, or defraud creditors, and made the transfers to High Five to delay, hinder or defraud creditors. Consequently, the transfers were inherently fraudulent pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

194.     Because the transfers to High Five were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, the Receiver may avoid the transfers, pursuant to Section 8(a) of the Illinois Uniform Fraudulent Transfer Act.

195.     As a direct and proximate result of TGC's fraudulent transfers to High Five, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $2,240,499, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant High Five:  (1) determining that the transfers from TGC to Defendant High Five were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant High Five, in an amount up to the full amount of the transfers received by Defendant High Five, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

**COUNT X**
**Violations of Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act**
**740 ILCS § 160/5(a)(2)**
**(Against High Five)**

196.     Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

197.     Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a
creditor, whether the creditor's claim arose before or after the transfer was made or
the obligation was incurred, if the debtor made the transfer or incurred the
obligation:

> (2) without receiving a reasonably equivalent value in exchange for
> the transfer or obligation, and the debtor:

>> (A) was engaged or was about to engage in a business or a
>> transaction for which the remaining assets of the debtor were
>> unreasonably small in relation to the business or transaction;
>> or

>> (B) intended to incur, or believed or reasonably should have
>> believed that he would incur, debts beyond his ability to pay as they
>> became due.

740 ILCS 160/5(a)(2).

198.     The Receiver acting on behalf of the Receivership Estate of TGC, as a creditor of

TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the

return of fraudulent transfers that Courtright caused TGC to make to each of the Funders pursuant

to the constructive fraud prong of the statute. 740 ILCS 160/5(a)(2).

199.     The transfers to Defendant High Five were made without TGC receiving reasonably

equivalent value in exchange for the transfers or obligations incurred.

200.     Also, the transfers to High Five occurred when TGC's remaining assets were

unreasonably small in relation to the business transaction(s) and when Courtright (through his

fraudulent domination and adverse control over TGC) intended to incur or believed, or reasonably

should have believed, that he would incur debts beyond TGC's abilities to pay as they became due.

201.     As a direct and proximate result of TGC's fraudulent transfers to High Five, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $2,240,499, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant High Five:  (1) determining that the transfers from TGC to Defendant High Five were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant High Five in an amount up to the full amount of the transfers received by Defendant High Five, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT XI
### Violations of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act
### 740 ILCS § 160/5(a)(1)
### (Against Fox)

202.     Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

203.     This is a claim to avoid and recover a fraudulent transfer pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

204.     Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

          (1) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

740 ILCS 160/5(a)(1).

205.    The Receiver acting on behalf of the Receivership Estate of TGC, as a creditor of TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright caused TGC to make to each of the Funders pursuant to the actual fraud prong of the statute.

206.    Courtright's transfers of funds to which Fox was not entitled and which were far in excess of the receipts as described above were part of a Ponzi scheme, and thus as a matter of law, were made and/or directed by Courtright with actual intent to hinder, delay or defraud creditors. Specifically, Courtright made the transfers of investor and lender funds to Fox with intent to hinder, delay or defraud.

207.    As detailed above, Courtright fraudulently, acting through his fraudulent domination, adverse interest in, and control of TGC, caused TGC to make at least $1,638,631.42 in fraudulent transfers to Defendant Fox with an intent to hinder, delay, or defraud TGC's creditors.

208.    Fox received the transfers without providing reasonably equivalent value in exchange for the transfers.

209.    At the time that TGC made the transfers to Fox, Courtright was operating it as a fraudulent scheme and as a Ponzi scheme to the detriment of TGC and its investors and/or creditors, as determined by the Court in the TRO and PI Orders.

210.    TGC made the transfers to Fox in furtherance of that fraudulent scheme and Ponzi scheme.

211.    At the time that TGC made the transfers to Fox, Courtright removed and/or concealed assets of TGC from the reach of its investors and/or creditors.

212. TGC made the transfers to Fox at Courtright's direction, as a result of his fraudulent domination, adverse interest in, and control of TGC and as part of his continued breaches of his fiduciary duties to TGC.

213. Thus, TGC had the actual intent to delay, hinder, or defraud creditors, and made the transfers to Fox to delay, hinder or defraud creditors. Consequently, the transfers were inherently fraudulent pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

214. Because the transfers to Fox were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, the Receiver may avoid the transfers, pursuant to Section 8(a) of the Illinois Uniform Fraudulent Transfer Act.

215. As a direct and proximate result of TGC's fraudulent transfers to Fox, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $1,638,631.42, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant Fox: (1) determining that the transfers from TGC to Defendant Fox were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant Fox, in an amount up to the full amount of the transfers received by Defendant Fox, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT XII
### Violations of Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act
### 740 ILCS § 160/5(a)(2)
### (Against Fox)

216.     Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

217.     Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(2).

218.     The Receiver, acting on behalf of the Receivership Estate of TGC, as a creditor of TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright caused TGC to make to each of the Funders pursuant to the constructive fraud prong of the statute. 740 ILCS 160/5(a)(2).

219.     The transfers to Defendant Fox were made without TGC receiving reasonably equivalent value in exchange for the transfers or obligations incurred.

220.     Also, the transfers to Fox occurred when TGC's remaining assets were unreasonably small in relation to the business transaction(s) and when Courtright (through his fraudulent domination and adverse control over TGC) intended to incur or believed, or reasonably should have believed, that he would incur debts beyond TGC's abilities to pay as they became due.

221.    As a direct and proximate result of TGC's fraudulent transfers to Fox, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $1,638,631.42, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant Fox: (1) determining that the transfers from TGC to Defendant Fox were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant Fox in an amount up to the full amount of the transfers received by Defendant Fox, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

### COUNT XIII
### Violations of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act
### 740 ILCS § 160/5(a)(1)
### (Against Sutton)

222.    Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

223.    This is a claim to avoid and recover a fraudulent transfer pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

224.    Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

740 ILCS 160/5(a)(1).

225.     The Receiver, acting on behalf of the Receivership Estate of TGC, as a creditor of TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Courtright caused TGC to make to Sutton as a broker for the cash advance funding pursuant to the actual fraud prong of the statute.

226.     Courtright's payments to Sutton were for assistance in obtaining cash advances from the Funders and as described above were part of a Ponzi scheme, and thus as a matter of law, were made and/or directed by Courtright with actual intent to hinder, delay or defraud creditors. Specifically, Courtright made the transfers of investor and lender funds to Sutton with intent to hinder, delay or defraud.

227.     As detailed above, Courtright fraudulently, acting through his fraudulent domination, adverse interest in, and control of TGC, caused TGC to make at least $100,000 in fraudulent transfers to Defendant Sutton with an intent to hinder, delay, or defraud TGC's creditors.

228.     Sutton received the transfers without providing reasonably equivalent value to TGC in exchange for the transfers.

229.     At the time that TGC made the transfers to Sutton, Courtright was operating it as a fraudulent scheme and as a Ponzi scheme to the detriment of TGC and its investors and/or creditors, as determined by the Court in the TRO and PI Orders.

230.     TGC made the transfers to Sutton in furtherance of that fraudulent scheme and Ponzi scheme.

231.     At the time that TGC made the transfers to Sutton, Courtright removed and/or concealed assets of TGC from the reach of its investors and/or creditors.

232.    TGC made the transfers to Sutton at Courtright's direction, as a result of his fraudulent domination, adverse interest in, and control of TGC and as part of his continued breaches of his fiduciary duties to TGC.

233.    Thus, TGC had the actual intent to delay, hinder, or defraud creditors, and made the transfers to Sutton to delay, hinder or defraud creditors. Consequently, the transfers were inherently fraudulent pursuant to Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

234.    Because the transfers to Sutton were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, the Receiver may avoid the transfers, pursuant to Section 8(a) of the Illinois Uniform Fraudulent Transfer Act.

235.    As a direct and proximate result of TGC's fraudulent transfers to Sutton, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $100,000, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant Sutton:  (1) determining that the transfers from TGC to Defendant Sutton were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant Sutton, in an amount up to the full amount of the transfers received by Defendant Sutton, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT XIV
## Violations of Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act
## 740 ILCS § 160/5(a)(2)
## (Against Sutton)

236.     Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

237.     Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act provides:

Sec. 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

>> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(2).

238.     The Receiver, acting on behalf of the Receivership Estate of TGC, as a creditor of TGC, has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act, pursuant to the constructive fraud prong of the statute. 740 ILCS 160/5(a)(2), to seek the return of fraudulent transfers that Courtright caused TGC to make to Sutton for services it provided as a broker procuring the merchant cash advance funding that allowed Courtright to perpetuate the above-described Ponzi scheme for an additional year.

239.     The transfers to Defendant Sutton were made without TGC receiving reasonably equivalent value in exchange for the transfers or obligations incurred.

240.    Also, the transfers to Sutton occurred when TGC's remaining assets were unreasonably small in relation to the business transaction(s) and when Courtright (through his fraudulent domination and adverse control over TGC) intended to incur or believed, or reasonably should have believed, that he would incur debts beyond TGC's abilities to pay as they became due.

241.    As a direct and proximate result of TGC's fraudulent transfers to Sutton, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $100,000, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by TGC and its principal Courtright.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant Sutton:  (1) determining that the transfers from TGC to Defendant Sutton were fraudulent and avoiding those transfers; (2) entering a money judgment against Defendant Sutton in an amount up to the full amount of the transfers received by Defendant Sutton, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

### COUNT XV
### Unjust Enrichment as to the Transfers
### (Against all Defendants)

242.    Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

243.    TGC conferred a benefit on each of the Funders and Sutton when it made the transfers, derived from the fraudulent scheme orchestrated by Courtright through TGC, to them in the following amounts:

EIN for $1,260,300;

Alpha for $809,460;

BMF for $1,669,333;

FundKite for $1,708,612.14;

High Five for $2,240,499;

Fox for $1,638,631.42; and

Sutton for $100,000.

244. Each Funder and Sutton had knowledge of the benefit that it received from TGC as a result of the transfers from TGC and voluntarily accepted and retained the benefit conferred.

245. It is inherently unfair and inequitable violating fundamental principles of justice, equity, and good conscience that the funds of investors defrauded in TGC's fraudulent scheme are retained by and used to personally benefit the Funders and Sutton, rather than being returned to the Receivership Estate for the benefit of all of the defrauded investors and/or creditors.

246. As a direct and proximate result of each Funders' and Sutton's retention of the respective amounts listed above, which TGC fraudulently transferred to each Funder and Sutton, the Receivership Estate has been damaged or diminished, and, under the circumstances, equity dictates that each Funder and Sutton should return the funds received from TGC and turn over any assets they may have acquired with those funds to the Receiver for the benefit of all of the defrauded investors and/or creditors.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against each Defendant: (1) determining that the transfers from TGC to each Defendant were fraudulent and unjust and avoiding those transfers; (2) entering a money judgment against each Defendant in an amount up to the full amount of the transfers received by each

Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT XVI
## Aiding and Abetting Breach of Fiduciary Duty
## (Against all Funders)

247.    Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

248.    During the relevant period, Courtright was TGC's Chief Executive Officer and owner of TGC, along with his wife.

249.    During the relevant period, Courtright had sole or nearly sole control over TGC and signed the Agreements.

250.    During the relevant period, Courtright knowingly and intentionally engaged in a scheme using TGC against its own interests to defraud its investors, thereby breaching his fiduciary duties to TGC.

251.    During the relevant period, Courtright misappropriated TGC's funds from lenders and investors by paying amounts to which Funders were not entitled in order to retire debt upon which he and his wife had executed personal guarantees.

252.    Funders knowingly and/or in bad faith substantially assisted Courtright's breaches of fiduciary duty to TGC by carrying out his instructions to misappropriate funds TGC obtained from its lenders and investors to pay Funders, by allowing him to use the funds TGC obtained from Funders to carry out a Ponzi scheme, and by providing critical financing to allow Courtright to perpetuate the Ponzi scheme and prevent TGC's collapse.

253.    Each Funder's knowledge and/or bad faith came from its review of TGC's bank account records and other financial information that demonstrated that TGC was running at a

deficit and was being held together by lender and investor funds and by knowingly receiving funds sourced from lenders and investors rather than solely Receipts as set forth in the Agreements.

254.    Moreover, each of the Funders had knowledge of sufficient facts regarding Courtright's wrongdoing that its actions amounted to bad faith.  Illinois courts have defined "bad faith" to include situations where the funder suspects that the fiduciary is acting improperly and deliberately refrains from investigating in order that it may avoid knowledge that the fiduciary is acting improperly.

255.    With access to TGC's bank statements and financial records upon request, and having reviewed the large lump sum deposits coming into TGC's bank account together with the daily sweeps from prior MCA funding transactions, the Funders should have investigated the source of funds into TGC's accounts and whether they were receivables that could be swept to repay their MCA funding.  Indeed, as alleged above, MCA industry standards dictate a thorough investigation of TGC's financial condition including sources of revenue and outstanding debts.

256.    The Funders did not conduct any of the investigations that would be commercially reasonable and justified in their industry.  Instead, they consciously avoided any such investigation and behaved in a commercially unjustifiable manner to enter into the MCA transactions with TGC and then to carry out the daily sweep of investor funds from TGC's bank account.

257.    Thus, despite such access to information and knowledge, the Funders knowingly and/or in bad faith participated in and provided substantial assistance to Courtright's breaches of fiduciary duties by, among other things: (i) allowing Courtright to misappropriate TGC's funds by using them for payment to Funders where the Agreements clearly limited payments to Funders to a percentage of Receipts; and by providing financing to TGC that allowed Courtright to perpetuate the fraudulent scheme.

258.    As a direct and proximate result of Funders' aiding and abetting of Courtright's breach of fiduciary duty to TGC, TGC has been damaged and continues to suffer damages.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against each Funder: (1) entering a money judgment against each Funder, in an amount up to the full amount of the transfers received by each Funder; (2) awarding Plaintiff damages for the full amount of damages caused by its aiding and abetting of the breach of fiduciary duty; (3) awarding Plaintiff other damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

## COUNT XVII
### Aiding and Abetting Fraud
### (Against all Funders)

259.    Plaintiff re-alleges the allegations set forth in paragraphs 1 through 101.

260.    During the relevant period, Courtright had sole or nearly sole control over TGC and signed the Agreements.

261.    During the relevant period, Courtright knowingly and intentionally engaged in a Ponzi scheme using TGC against its own interests to defraud its investors.

262.    During the relevant period, Courtright misappropriated TGC's funds from lenders and investors by paying amounts to which Funders were not entitled in order to retire debt upon which he and his wife had executed personal guarantees.

263.    Funders knowingly and/or in bad faith substantially assisted Courtright's fraud by carrying out his instructions to misappropriate funds TGC obtained from its lenders and investors to pay Funders, by allowing him to use the funds TGC obtained from Funders to carry out a Ponzi scheme, and by providing critical financing to allow Courtright to perpetuate the Ponzi scheme and prevent TGC's collapse.

264.     Funder's knowledge and/or bad faith came from their review of TGC's bank account records and other financial information that demonstrated that TGC was running at a deficit and was being held together by lender and investor funds and by knowingly receiving funds sourced from lenders and investors rather than solely Receipts as set forth in the Agreements.

265.     Moreover, each of the Funders had knowledge of sufficient facts regarding Courtright's wrongdoing that its actions amounted to bad faith.  Illinois courts have defined "bad faith" to include situations where the funder suspects that the fiduciary is acting improperly and deliberately refrains from investigating in order that it may avoid knowledge that the fiduciary is acting improperly.

266.     With access to TGC's bank statements, the Partner Agreements, and financial records upon request, and having reviewed the large lump sum deposits coming into TGC's bank account together with the daily sweeps from prior MCA funding transactions, the Funders should have investigated the source of funds into TGC's accounts and whether they were receivables that could be swept to repay their MCA funding.  Indeed, as alleged above, MCA industry standards dictate a thorough investigation of TGC's financial condition including sources of revenue and outstanding debts.

267.     The Funders did not conduct any of the investigations that would be commercially reasonable and justified in their industry.  Instead, they consciously avoided any such investigation and behaved in a commercially unjustifiable manner to enter into the MCA transaction with TGC and then to carry out the daily sweep of investor funds from TGC's bank account.

268.     Despite such access to information and knowledge, the Funders knowingly and/or in bad faith participated in and provided substantial assistance to Courtright's fraud by, among other things, allowing Courtright to misappropriate TGC's funds by using them for payment to

Funders where the Agreements clearly limited payments to Funders to a percentage of Receipts, and by providing financing to TGC that allowed Courtright to perpetuate the fraudulent scheme.

269.     As a direct and proximate result of the Funders' aiding and abetting of Courtright's fraud, TGC has been damaged and continues to suffer damages.

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant Funders: (1) entering a money judgment against each Defendant Funder, in an amount up to the full amount of the transfers received by each Funder; (2) awarding Plaintiff damages for the full amount of damages caused by its aiding and abetting of the breach of fiduciary duty; (3) awarding Plaintiff other damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

DATED: April 2, 2021                             Respectfully submitted,

                                                 /s/Kenneth Dante Murena
                                                 Kenneth Dante Murena, Esq.
                                                 Florida Bar No. 147486
                                                 DAMIAN & VALORI LLP
                                                 1000 Brickell Avenue, Suite 1020
                                                 Miami, Florida 33131
                                                 Telephone: (305) 371-3960
                                                 Facsimile: (305) 371-3965
                                                 Email: kmurena@dvllp.com
                                                 *Counsel for Melanie E. Damian,*
                                                 *Court-Appointed Receiver*
                                                 *(Admitted pro-hac vice)*

                                                 and

                                                 Kevin B. Duff (kduff@rdaplaw.net)
                                                 Ill. Bar No. 6210491
                                                 Rachlis Duff & Peel, LLC
                                                 542 South Dearborn Street, Suite 900
                                                 Chicago, Illinois 60605
                                                 Telephone: (312) 733-3950
                                                 *Counsel for Melanie E. Damian,*
                                                 *Court-Appointed Receiver*