IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELANIE E. DAMIAN, as Receiver for TODAY'S GROWTH CONSULTANT, INC. (dba THE INCOME STORE),<br><br>Plaintiff,<br><br>v.<br><br>EIN CAP, INC. *et al.*,<br><br>Defendants. | No. 21-cv-01792<br><br>Judge John F. Kness |

**MEMORANDUM OPINION & ORDER**

Plaintiff Melanie E. Damian, in her capacity as the Court-Appointed Receiver for Today's Growth Consultant, Inc. (TGC), brings suit against Defendants, six entities that provided funding to TGC. Plaintiff asserts claims for fraudulent transfer, unjust enrichment, and aiding and abetting breach of fiduciary duty and fraud. Defendants have moved to sever and argue that the joinder of all Defendants in a single lawsuit is improper under Rule 20(a)(2) of the Federal Rules of Civil Procedure. (Dkt. 95.) For the following reasons, Defendants' motion to sever is denied.

I. **BACKGROUND**

Kenneth Courtright was the owner and controlling person of nonparty Today's Growth Consultant, Inc. (TGC). (Dkt. 1 ¶ 22.) From January 2017 through October 2019, Courtright, via TGC, entered into numerous Consulting Performance Agreements (CPA) with investors; under those agreements, the investors would

provide both "up-front payments and ongoing payments in the form of advertising and e-commerce revenues to TGC" in exchange for TGC promising "to pay investors a minimum guaranteed rate of return, in perpetuity, on revenues generated by websites that TGC acquires or builds for the investors and then develops, maintains, and hosts." (*Id.* ¶¶ 1, 23.) In total, TGC and Courtright raised at least $87 million from more than 700 investors. (*Id.* ¶ 23.)

These promises, however, soon hit a brick wall in the marketplace: as Plaintiff alleges, the monthly revenue generated from TGC's websites was significantly less than TGC's monthly payment obligations to the investors and TGC's monthly overhead expenses. (*Id.* ¶ 27.) For example, from January 2017, the websites generated only $9 million while TGC paid at least $30 million to investors. (*Id.* ¶ 28.) TGC was able to cover the shortfall by using the up-front payments received from new or repeat investors, making TGC's business model what Plaintiff contends was a classic Ponzi scheme. (*Id.* ¶ 29.) In support of this theory, Plaintiff alleges TGC would have been considered insolvent were "revenues" from new investor funds excluded. (*Id.* ¶ 27.)

Despite significant revenue shortfalls, TGC was able to continue paying investors their guaranteed returns each month until December 2019, when the company put a moratorium on investor payouts. (*Id.* ¶35.) Soon thereafter, the Securities and Exchange Commission (SEC) filed an enforcement action against TGC and Courtright seeking a temporary restraining order (TRO). *SEC v. Today's Growth*

*Consultant Inc.*, Case No. 1:19-cv-8454 (N.D. Ill.) (Dkt. No. 2) (the "SEC Action").[1] (*Id.* ¶ 1.) The SEC's requested TRO was granted, freezing TGC and Courtright's assets, ordering preservation of all relevant documents, books, and records concerning the alleged fraud, and appointing a Receiver to implement the terms of the TRO by, among other things, taking control of TGC's assets and business.[2] (*Id.* ¶¶ 1-2.) The Receiver reviewed TGC's books and records and confirmed that TGC's business was likely a Ponzi scheme. For instance, 2018 website revenue was below $2 million but payouts to investors approximated $12.7 million, and 2019 website revenue was under $4 million while investor payouts totaled $16.5 million. (*Id.* ¶ 4.)

The Receiver also discovered that, from May through December 2019, TGC relied on numerous merchant cash advances (MCA) from various lenders (the "Funders") to cover the revenue shortfall. (*Id.* ¶ 37.) According to Plaintiff, an MCA is a financing arrangement under which a lender advances a lump sum that the borrower pays back using its receivables. (*Id.* ¶¶ 38–41.) Sutton Funding NY, Inc. ("Sutton") brokered MCAs on behalf of TGC for commission. (*Id.* 48–50.) TGC's receivables, which were used to support the MCA arrangement, included "all payments made to TGC in the ordinary course of business as a result of the sale of goods and services provided by TGC." (*Id.* ¶ 51.) The MCA funding from every Funder

---

[1] A separate criminal complaint was filed against Courtright on February 4, 2020, accusing him of committing wire fraud. *United States v. Kenneth E. Courtright*, Case No. 20-CR-77 (N.D. Ill.). (*Id.* ¶ 5.)

[2] Because investor payouts stopped in December 2019 and most investors have not received the return of their investment or all amounts due to them under the CPAs, the investors have asserted significant claims against the Receivership Estate, and the Receiver has approved claims totaling more than $65 million. (*Id.* ¶ 36.)

3

was deposited into a single bank account, the PNC Account, which was also used to hold investor funds. (*Id.* ¶ 47.) The Funders were provided access to the PNC Account to perform daily "sweeps" to withdraw receivables owed as repayment. (*Id.* ¶ 47.) Because of fund comingling and the relatively low value of true receivables, "the vast majority of the funds" swept by the Funders from the PNC Account "was from lenders and investors." (*Id.* ¶ 92.)

The Receiver ("Plaintiff") subsequently filed a lawsuit against Sutton and six Funders (collectively, "Defendants").[3] Plaintiff brings claims for unjust enrichment and fraudulent transfer against all Defendants and additional claims for aiding and abetting breach of fiduciary duty and fraud against the Funders, seeking to recover the amounts remitted to each Defendant under the MCAs. (*Id.* ¶¶ 102–269.) The MCAs funded TGC's ongoing operations, which allegedly "propped up the Ponzi scheme and allowed Courtright to continue his fraud against TGC and its investors." (*Id.* ¶ 37.) Plaintiff further alleges that Defendants (the Funders) engaged in "commercially unreasonable behavior" because they abandoned their typical due diligence practices. (*Id.* ¶ 37–49.) Proper due diligence by the Funders would have uncovered that TGC was overleveraged and generated the bulk of its revenue from large, irregular lump-sum deposits from new investors instead of genuine receivables. (*Id.* ¶ 45.)

Defendants filed the present motion to sever for improper joinder, requesting that the claims against each Defendant be severed into separate lawsuits. (Dkt. 95-

---

[3] Plaintiff and Defendant Sutton entered a stipulation of dismissal of Plaintiff's claims against Sutton on September 15, 2021. (Dkt. 66.)

4

1, at 4.) Defendants argue that joinder is improper because the MCAs were "completely different transactions, under different terms, on different dates, for different amounts of money." (*Id.*) Defendants also contend that "there is no connection between the Defendants whatsoever except that all entered into 'MCA funding transactions' with TGC." (*Id.* ¶ 4–5.) Accordingly, the two requirements for joinder under Rule 20 of the Federal Rules of Civil Procedure—that the claims arise out of the same transaction or series of transactions and that a common question of fact or law exists—are, Defendants insist, absent here. (*Id.* 5–6.)

## II. LEGAL STANDARD

Rule 21 of the Federal Rules of Civil Procedure allows district courts to "add or drop a party" or "sever any claim against a party" if parties are misjoined. Fed. R. Civ. P. 21. Rule 20 establishes the requirements for permissive joinder of parties. *See* Fed. R. Civ. P. 20. Defendants may be joined in a single action under Rule 20(a)(2) if two requirements are met: (1) the plaintiff's claims against the defendants arise "out of the same transaction, occurrence, or series of transactions or occurrences," and (2) there is a "question of law or fact common to all defendants." *Estée Lauder Cosmetics Ltd. v. Partnerships and Unincorporated Associations Identified on Schedule A*, 334 F.R.D. 182, 185 (N.D. Ill. 2020) (quoting Fed. R. Civ. P. 20(a)(2)(A)–(B)). A party that seeks joinder "bears the burden of demonstrating that joinder is proper under [Rule] 20(a)(2)." *Id.* In determining whether Rule 20(a)(2)'s requirements are met, the Court "must accept the factual allegations in a plaintiff's complaint as true." *Id.* (quoting *Desai v. ADT Sec. Servs., Inc.*, 2011 WL 2837435, at

5

*3 (N.D. Ill. July 18, 2011)). District courts have wide discretion in determining joinder of parties. *Receivership Mgmt., Inc. v. A.J. Corso & Assocs., Inc.*, 2021 WL 1222897, at *11 (N.D. Ill. Mar. 31, 2021). Joinder promotes judicial efficiency "and is strongly encouraged." *Id.* (citing *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2012)).

### III.   DISCUSSION

#### A.   Plaintiff's Claims Against Defendants Arise Out of the Same Series of Transactions.

To determine whether a plaintiff's claims arise out of the same transaction or series of transactions under Rule 20, courts apply the "logical-relationship test." *In re EMC Corp.*, 677 F.3d 1351, 1358 (Fed. Cir. 2012) (Defendants "satisfy the transaction-or-occurrence test of Rule 20 when there is a logical relationship between the separate causes of action."); *see Lozado v. City of Chicago*, 2010 WL 3487952, at *2 (N.D. Ill. Aug. 30, 2012) (applying logical-relationship test to Rule 20). A logical relationship exists "if there is substantial evidentiary overlap in the facts giving rise to the cause of action against each defendant." *EMC Corp.*, 677 F.3d at 1358. The "logical-relationship test" is not a rigid formula; instead, courts use a "case-by-case approach" with an eye towards Rule 20's purpose of "promot[ing] judicial economy by permitting all reasonably related claims for relief by or against different parties to be tried in a single proceeding." *Id.*; *see Ross v. Bd. of Educ. Twp. High Sch. Dist. 211*, 486 F.3d 279, 284 (7th Cir. 2007) (Courts should "consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds.") (cleaned up).

6

Defendants say there is no logical relationship here because the "*only* common threads . . . [are] that all of the Defendants offer the same or similar product," MCA funding.[4] (Dkt. 95-1, at 7.) Each Defendant independently provided MCA funding to TGC, and the Receiver does not allege "any sort of conspiracy between the Defendants," that "the Defendants acted in concert in any way," or that any Defendant "induced any other [D]efendant" to provide MCA funding to TGC. (*Id.* at 7–8.) Because Defendants neither coordinated their actions nor conspired together, they say different witnesses and documentary proof will be required against each Defendant. (*Id.* at 10.)

Plaintiff responds that Defendants, by requiring concerted action, interpret the logical relationship test too narrowly. According to Plaintiff, the "logical-relationship test" mandates a wholistic inquiry into the general relatedness of the claims, and many facts alleged in the complaint prove the requisite connection. First, the conduct at issue is nearly identical: each Defendant deposited MCA funding into TGC's PNC Account and swept funds from that account—a mix of investor funds, website revenue, and other Funders' loan proceeds—into their own account. (Dkt. 101, at 5.) Second, the effect of each Defendant's conduct was temporarily to prop up TGC and Courtright's Ponzi scheme, allowing new and existing investors to be further defrauded. (*Id.* at 5–6.) Third, judicial economy is best served by joinder because there

---

[4] Defendants argue that Defendant World Global Capital, LLC (WGC) should be severed from the lawsuit because WGC never provided MCA funding to TGC. (Dkt. 95-1, at 4 n.1.) Plaintiff, however, alleges in the complaint that WGC provided MCA funding to TGC (Dkt. 1, ¶¶ 59, 64), and the Court must accept this allegation as true in evaluating Defendants' motion to sever. *Estée Lauder*, 334 F.R.D. at 185.

7

is substantial evidentiary overlap: proving fraudulent transfer requires Plaintiff to establish that TGC was operating as a Ponzi scheme or was insolvent at the time the transfers were made, which can be accomplished via a single expert if joinder is permitted. (*Id.* at 6.) Plaintiff finally notes the temporal proximity (six months) during which all the MCAs occurred. (*Id.* at 8.)

Because they were nearly identical in purpose and effect, the MCAs constitute the "same series of transactions." Fed. R. Civ. P. 20(a). Contrary to Defendants' position, conspiracy or concerted action is not required for there to be a logical relationship. *See Receivership Mgmt.*, 2021 WL 1222897, at *12 (joinder proper where Plaintiff did not plead "any relationship among the Defendants, . . . that Defendants acted in concert, coordinated, or conspired with respect to any transaction"). In *Receivership Management*, multiple insurance-broker defendants marketed and sold an ERISA plan on behalf of a single client. *Id.* at *1. Apart from selling the same product on behalf of the same client, the defendants otherwise had no relationship with one another. *Id.* Although the ERISA plan was financially unsound, defendants each continued selling the plan to unwitting customers resulting in significant unpaid claims when the plan became insolvent. *Id.* at 2. This Court held in *Receivership Management* that there was a logical relationship between the defendants because the conduct and effect was identical: each defendant contracted with the same client to market and sell the same insolvent ERISA plan to the detriment of enrollees. *Id.* at 12.[5]

---

[5] Plaintiff cited *Receivership Management* in its supplemental response to Defendants' motion to sever. (Dkt. 109, at 3–5.)

As in *Receivership Management*, there is substantial overlap in the facts giving rise to the claims against each Defendant. *EMC Corp.*, 677 F.3d at 1358. Within a period of six months, each Defendant provided TGC with MCA funds in exchange for TGC's future receivables. The MCAs allegedly aided and abetted TGC's fraud by propping up the TGC Ponzi scheme, allowing additional investors to be defrauded. Moreover, each Defendant recouped their funds by performing daily sweeps from the PNC Account, siphoning a significant amount of investor funds. These sweeps were allegedly made while TGC was insolvent and caused Defendants to be unjustly enriched at the expense of investors. Each Defendant's conduct was substantially similar in purpose and effect.

In addition, TGC's comingling of funds means that Defendants are related to each other, even if unintentionally. TGC pooled all MCA funds into a single bank account; Defendants then swept funds from that account, removing a mix of investor funds *and* MCA funds provided by other Defendants. If an accounting of the swept funds and their sources is relevant to liability or remedies, joinder of the Defendants promotes efficient resolution of the claims.

Moreover, because of the evidentiary overlap against each Defendant, joinder promotes judicial economy. To prove fraudulent transfer, Plaintiff will be required to establish that TGC was operating as a Ponzi scheme or was insolvent at the time each of the MCAs were made. (Dkt. 101, at 6.) Joinder will allow Plaintiff to submit a single expert report that details when TGC became insolvent. This expert could testify at a single deposition and trial. Conversely, severance would require Plaintiff

9

to submit multiple expert reports and have the expert testify at multiple depositions and trials. Conservation of the Court's and the parties' resources on this score weighs heavily in favor of joinder.[6] *See First Time Videos, LLC v. Does 1-500*, 276 F.R.D. 241, 252 (N.D. Ill. 2011).

Defendants contend that an individualized inquiry will be necessary to determine whether each Defendant is liable. For example, Plaintiff alleges that Defendants would have uncovered TGC's insolvency if they had conducted commercially reasonable due diligence before making the MCAs. (Dkt. 1, ¶¶ 37–49.) Defendants assert that each of their due diligence processes vary, so the witnesses and documentary evidence needed to determine commercial reasonability will differ; this means joinder will not conserve judicial resources. (Dkt. 95-1, at 9.). But complete evidentiary overlap is not required for there to be a logical relationship. *See H-D U.S.A. v. Partnerships and Unincorporated Associations Identified on Schedule "A"*, 2021 WL 780486, at *2 (N.D. Ill. Mar. 1, 2021) (Joinder is improper if "there is no evidentiary overlap.") Given the substantial similarities between each MCA transaction and its effect, there is significant evidentiary overlap.

Finally, the cases Defendants rely upon are distinguishable. Defendants contend that courts "routinely find that financial transactions with unrelated entities do not constitute the same or a series of transactions for the purposes of Rule 20." (Dkt. 95-1, at 7 (citing *Visendi v. Bank of America, N.A.*, 733 F.3d 863 (9th Cir. 2013);

---

[6] Defendants are represented by the same counsel. Joinder is thus likely to promote judicial economy because Defendants can efficiently coordinate in producing joint filings in a single case. *See Civil Aeronautics Bd. v. Carefree Travel, Inc.*, 513 F.2d 375, 384 (2d Cir. 1975) (Joinder is proper in part because all defendants were represented by the same counsel).

10

*Abraham v. Am. Home Mortg. Serv., Inc.*, 947 F. Supp. 2d 222 (E.D.N.Y. 2013); *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674 (6th Cir. 1988)).) But the cases cited by Defendants involved substantially more parties or outlier defendants.

This case involves one plaintiff and six defendants, but there were 160 plaintiffs and 15 defendants in *Visendi* and hundreds of plaintiffs and dozens of defendants in *Abraham*. 733 F.3d at 695–96; 947 F. Supp. 2d at 229. Joinder of hundreds of parties will usually detract from judicial economy because litigation becomes logistically unmanageable. *See Malibu Media, LLC v. John Does 1-14*, 287 F.R.D. 513, 522 (N.D. Ind. 2012) (distinguishing unmanageable joinder involving hundreds of defendants from efficient joinder of 12 defendants).

In addition, the severed defendants in *Michaels* made loans to the plaintiff that had "no relation to loans made by the other defendants," and the loan documents contained "an entirely different representation as to its interest rate than the loan documents of the other defendants." 848 F.2d at 682. Because the purpose and terms of their loans differed from the other similarly situated defendants, the severed defendants were outliers. Conversely, Defendants here provided MCAs to TGC for the same purpose and under similar terms, and Defendants do not allege any distinguishing feature among Defendants other than due diligence processes.

Accordingly, the cases cited by Defendants do not undermine the Court's finding that joinder is proper here—Defendants engaged in substantially similar transactions with nearly identical effects. Because Defendants' MCAs were part of the same series of transactions, the first requirement for joinder under Rule 20 is

11

satisfied.

### B. There is a Question of Law or Fact Common to All Defendants.

Plaintiff must prove that each Defendant provided MCA funding while TGC was insolvent. Because the timing of exactly *when* insolvency visited TGC is a factual question common to all Defendants, Rule 20's common question requirement is met. *See Eclipse Mfg. Co. v. M and M Rental Center, Inc.*, 521 F. Supp. 2d 739, 745 (N.D. Ill. 2007) (joinder proper because there was "at least *one* common factual issue between the parties") (emphasis added).

Defendants dispute that a common question exists by again urging that each Defendant independently provided MCA funding and conducted due diligence differently. (Dkt. 95-1 at 9.) Merely that factual differences exist, however, does not necessarily defeat joinder; only one common issue of fact or law is required. *Eclipse*, 521 F. Supp. 2d at 745. Because there is a common question of fact as to when TGC became insolvent, Rule 20's second requirement for joinder is satisfied.

### C. Other Considerations

Even if the two requirements for joinder under Rule 20 are met, district courts may still sever defendants if "joinder would create 'prejudice, expense or delay.'" *Chavez v. Ill. State Police*, 251 F.3d 612, 632 (7th Cir. 2001) (quoting Wright & Miller, Federal Practice and Procedure § 1652 at 396 (2001)). Defendants argue that they will be unfairly prejudiced because joinder will lead to "inevitable confusion . . . regarding facts unique to each defendant considering the number of defendants, transactions and independent facts." (Dkt. 95-1, at 10.) Defendants do

not otherwise elaborate how Defendants will be prejudiced by joinder. At this stage, there is no apparent prejudice to Defendants from joinder. Depending on circumstances, however, Defendants may file a renewed motion to sever before trial if it appears that conducting a trial with all Defendants at once would create the risk of unfair prejudice.

## IV. CONCLUSION

Defendants' motion to sever (Dkt. 95) is denied.

SO ORDERED in No. 21-cv-01792.

Date: March 17, 2023

JOHN F. KNESS
United States District Judge